## THE EMILY A. FOOTE.

### FISKE v. THE EMILY A. FOOTE.

(District Court, E. D. Virginia. March 30, 1896.)

1. COLLISION BETWEEN STEAMERS—INCOMPETENT LOOKOUT.
   A steamer coming up the river, and rounding in to the pier at Pinner's Point, below Norfolk, *held* in fault for collision with a steam barge, which was just leaving the slip, because her lookout, who saw the barge at a considerable distance, either neglected to report the fact to the pilot, or the pilot neglected to recognize and respond to his report.

2. SAME—INCOMPETENT LOOKOUT.
   The employment of incompetent, ignorant, and heedless men as lookouts, upon vessels moving in the crowded harbor of Norfolk and the approaches thereto, condemned.

This was a libel by S. G. Fiske, master of the steam barge O. R. Whitney, against the steamer Emily A. Foote, to recover damages resulting from a collision.

On the night of the 3d of January last, between 6 and 7 o'clock, when it had become quite dark, the steam barge O. R. Whitney, 109 tons, on a trip from Smithfield, on James river, to Norfolk, touched at the pier on Pinner's Point below Norfolk, threw out her lines, and made temporarily fast at the wharf. On inquiry of the wharfman, her master, Fiske, was informed that she could not remain there; that the Clyde steamer Gulf Stream, of Philadelphia, was expected, and was then in sight, destined for that wharf; and that all the wharf space of the pier was otherwise engaged. Under necessity of leaving at once, she moved out from the pier slowly, bound up to Norfolk. The witnesses she put upon the stand testified that, before she was entirely clear of the pier, she saw the lights of a steamer bound apparently for the wharf, and gave two clear whistles, which were preceded by a defective whistle, that was made indistinct by water in the pipe. This signal of two whistles seems to have been given for a steamer at some little distance down the river; and she soon gave another signal of two whistles, and followed it by a third signal of two additional ones, making three signals of two whistles each in the course of a very brief interval. Most or all of them were given for a steamer which was approaching, and had got very near, which proved to be the Emily A. Foote These signals were given before the barge had got more than 50 or 75 feet clear of the wharf, before her speed was more than two miles an hour, and when she had not obtained steerage way, just after her engines had got three bells and a jingle from the pilot house to go back hard, and had obeyed them. All of the Whitney's lights were in place and burning. The Foote had come up from beyond Old Point, and was making for the Pinner's Point pier. The Foote had sighted the barge when abreast of the red buoy, which lies 470 feet below the pier on the south of the channel, and was rounding in from the buoy towards the pier. She claims not to have seen the lights of the barge, nor heard her whistles, and did not pass to port of the barge in response to her signals. Just after the rounding into the slip in front of the pier, she struck the barge on her starboard bow two or three feet aft of her stem. The barge was sunk, and filled with water, one or more of the pipes of her boiler having exploded by the sea water which inundated the hold. The barge's deck, before she was struck, was not more than an average of two feet and a half above the level of the water. She had a deck load of railroad ties on, the level of the top of which was about even with the top of her cabins, which was some five feet above the deck. The barge was afterwards raised and repaired, at·an expense which is shown in the proofs, which constitutes

the chief part of the damages claimed by the libel in this cause. The water around the pier at Pinner's Point, and out to the main channel, is artificially deepened to the width, including the pier, of some 400 feet. The collision happened in this deepened slip of water in or near the main channel, somewhere about 150 to 175 feet from the end of the pier. The pier consists of two parts, with a slip between, a warehouse standing on each part, the eaves of which are 17 feet above the floor of the pier, which floor is 9 feet above the water at mean tide. The floor of the pier extends 8 feet out from the sides of the warehouses, and the width of the pier, including the slip between its two parts, and including the side floors, amounts to a total of 278 feet. There were 4 electric lights along the front of the pier, placed on each corner of the two parts into which it is divided. Besides these front lights are 6 other lights, 3 on each side of the warehouses, making 10 in all, front and sides. They are of 32 candle power. As before stated, the night was dark. There was a strong wind from the northward, and the tide was in the last quarter of flood, moving in at about the rate of a mile an hour, according to some of the testimony, but more probably at the rate of two miles an hour. The strong wind also blew the Foote inward.

The wharfman, who is a disinterested witness, states that, when the barge had got about 20 feet out from the pier, he heard the signal of two clear whistles, which immediately followed a defective whistle, but that he left the front of the pier immediately, and paid no further attention to the barge. Lippold, a stevedore, and disinterested, who was out on the end of the pier when the barge left it, also heard the signal of two distinct whistles as she was moving off. Both of these witnesses saw the stern light of the barge as she moved off. J. H. Kief, an employé of the Southern Railway Company on Pinner's Point pier, recollects seeing the stern light and the head light of the barge up, when she was ordered away, and does not recollect her side lights, as he was paying no attention to her. He heard the defective whistle, and then the signal whistles clear and loud. William Dorn, a lineman on duty on the pier, saw the barge as she was lying at the pier, with her bow pointing down the river, her port side to the pier, and saw her stern light and her red light. John Lynch, on duty on the pier for the Southern Railway Company, saw the barge lying at the pier with her port side to it just before she left, and noticed her stern light up and her red light. Her starboard side being off shore, he did not see or know what was there.

The most important witness on the part of respondent was John Dyott, the lookout on duty just before the collision. I give extracts from the passages of his testimony which bear most materially on the controlling facts at issue in this cause: "I have no particular occupation. Have followed the sea very little. Have been to sea four trips, I think. Have been on small schooners of ten tons some fifteen years. Hold no license. Was on steamer Foote as helmsman, lookoutsman, filling the mate's place. This was my first trip. I was on the lookout on night of collision, outside on the pilot house. Was elevated above the deck. Was going two or two and a half miles an hour before I discovered the bugaboo. Saw the red buoy. There, the wheel was thrown over hard a-port to round the red buoy. When about midships of the buoy, discovered the barge. Did not see what kind of boat it was. It was perfectly dark aboard of her. Saw no lights, and heard no whistles. Man was standing on her between the bow and the pilot house. As soon as I saw the boat, told the captain, and he gave the bells to go back. We struck her, and she passed our bow, and then I saw lights in engine room and cabin; saw the lights in the windows. The decks seemed to be low down. If there had been any lights, I could have seen them, because I was up there, and I am neither color-blind nor hard of hearing, and I heard no whistles. When I first saw the boat, she could not have been more than 60 or 75 feet away. We were going slow. The barge seemed to be coming as fast as she could, coming right into us. Don't know how the tide was. I don't take much notice of tides. I am always ashore. As soon as I put my eyes on the object, I says to Captain Hamilton, 'There's a boat;' and he gave bells to go back immediately. I never saw the wharf [pier] until after we struck and got clear of her; then I saw the wharf. Never saw lights on the wharf until we got clear of the boat. No lights on the wharf, but one on the corner of the wharf. Saw electric lights, but not on

the front of the wharf. Couldn't see the front of the wharf where we struck. Before we noticed the boat, I did not see the lights on the wharf. It was my first trip. There was quite a lot of lights, and, being my first trip, I didn't notice them. (Repeating.) I did not see the end of the wharf and electric lights until after I saw this vessel, and after the collision, and after we got clear of the vessel. I did not see the wharf. It was so dark I couldn't see it, and I did not see the electric lights. I did not know how many lights were on the end of the wharf. It was my first time. I don't think there were any lights on the side of the wharf. I don't know. I never noticed the electric lights around the wharf. I know there is lots of lights around Norfolk, electric lights and others, but I never noticed them particularly. I was looking out for vessels, not for shore lights."

Brief parts of testimony of other witnesses were as follows: Garrett P. Messick, engineer of the steamer Foote, said: "She carries 50 to 75 pressure of steam, with 75 to 80 revolutions, making 8 to 8½ miles an hour. About Lambert's Point got one bell to slow down. After that she was running very slowly, say, at fourth speed for ten minutes. Then got 3 bells and a jingle to slow down hard, and reversed engine at once, causing a back motion of steamer. Then felt the jar of collision. Foote hailed from Tappahannock. Saw no lights, and heard no signals on barge." John Green (colored), fireman: "I heard three bells and a jingle ten minutes before we got to the red buoy. Had 75 to 80 pressure on when we had collision. Had then been backing the engine for one minute. We were running before the wind." Ephraim Campbell (colored), deck hand, said: "We passed Old Point about dark. I was on deck smart while before collision. Captain Hamilton was inside of pilot house, and Captain Dyott in front outside. Myself, Wood Rankin, and Ned Rankin were on deck. Wilson was there also. Didn't hear any whistles before the collision." W. T. Wilson (colored), cook, said: "I was standing forward on ford. deck at collision, 12 feet from stem of Foote. Captain Dyott was right in front of pilot house, on the upper deck. I heard no whistles and saw no lights at all on barge before the collision. We had then all eaten supper and cleaned up things, and me and the other boys were on deck. We were going under one bell, slow. I heard no whistles, and didn't see a single light. I was just up there looking out to see what I could see coming into town. Heard three bells and a jingle just before the collision, and I felt the wheel going back. Didn't hear any report of the Capt. before I heard a man holler from the barge. Didn't hear Capt. Dyott make any report until then. Didn't see any lights before or after the collision, on the barge. When I come up on deck after supper, I saw town lights and the lights on the wharf we were going to. They were lantern lights. We saw electric lights on another wharf." (His testimony is utterly self-contradictory and confused on the subject of lights.) Ned Rankin (colored), deck hand, said: "I helped in pilot house sometimes. But Capt. Hamilton was in there coming up from Old Point. Capt. Dyott was up in front of him. Barge looked like she was moving right fast coming across our bow. The wind was blowing. It looked like a head wind to me." Wood Rankin (colored), deck hand, seemed to be very dull, and gave testimony in line with that of his comrades on the Foote, saying, among other things, he was a deck hand, and was on deck of Foote, saw no lights on barge, and heard no whistles. "Me and the other deck hands were all out on deck long time before the collision." Edd Rankin said: "I helped the captain sometimes, and took the wheel in the pilot house. Was on the lower deck going up from Lambert's Point. Capt. gave one bell after we passed there, to slow down, and we then went very slow when we saw the object ahead. Didn't see red buoy. Never saw no lights on the barge until we hit her, and then I saw only one light, a globe lantern. Heard no whistles at all. The barge was moving fast when they struck. She looked like she was coming across our bow. It looked to me like the wind was blowing on our bow. All the deck hands were on deck, as we came up, setting down talking. Saw lights on the wharf we were coming to, but didn't give constant attention to them." Robert Hamilton, master of the Foote, said, among other things: "Had had license for eight years, as master for four years. I was at the wheel from before we got to Old Point up to time of collision. Our speed is about eight miles. We slowed down just after passing Lambert's Point. Then moved at slow

speed, slower all the time. As soon as sighted the red buoy, ported my wheel to go in the slip at Pinner's Point. Heard no whistles as I ported, except those of the steamer Gulf Stream. When I had my wheel hard a-port, saw this boat ahead about 75 or 80 feet, and I went back full speed. I saw it about when the lookout reported it. This back movement of engine had a tendency to stop the steamer. It was a dark night, the wind blowing about N. N. E. very hard, about 18 to 20 miles an hour, astern of us. There were electric lights on the pier, one right on the corner, and four on the side; 16 candle power; little incandescent lights, about ten feet above the dock. They bend down and shine right on the wharf. Can see them a good distance. The men, except the fireman and engineer, were all back aft down on the deck, talking. I never heard any signals at all, and never saw anything at all ahead until I saw the bow of the barge. At that time the Foote was barely making three miles. The wind helped us along a little. With wind and tide helping us, still we were making barely three miles through the water. The engines were driving the boat two miles of this. After we had come alongside of the barge, saw the lights of the cabin. Before that saw no lights at all, neither the bow light, nor either of the side lights; no lights at all. Never heard any whistles. Struck the barge on her starboard bow, about two feet and a half from her stem. The Foote is an ocean-going steamer,—a fishing steamer. Our lights were all up and burning. The barge had about 2½ feet of freeboard, and was very low down in the water. The Foote has about 70 tonnage, and is about 108 feet long. I ported at the red buoy to go into the slip, which made a change in our course of about three points. The barge was right ahead when we saw her, about 75 or 80 feet off, and between me and the wharf. When we came together, she was about 100 feet clear of the wharf. Barge was moving in the teeth of the wind. We struck her about ten minutes to 7 p. m. I made protest, but did not extend it." (It makes no mention of there being no lights on the barge.)

It has not been attempted in the foregoing epitome of the testimony of respondent's witnesses to do more than touch the salient points of the case.

Robert M. Hughes, for libelant.
Floyd Hughes, for respondent.

HUGHES, District Judge (after stating the facts). It is very plain that the evidence given on either side of this controversy is entirely contradictory on all material facts, and cannot be reconciled. That of one side or the other is essentially untrue; and I am driven to consider and determine which is the more reliable. I have rarely heard a case in which the correct navigation of a vessel was more clearly established than that of the steam barge O. R. Whitney was, on the night of the collision out of which this libel grew. I saw and heard every witness that was examined in her behalf, and I was struck with the apparent candor and consistency which characterized their testimony. There was nothing in their bearing or in their manner of testifying which suggested a suspicion that they had been "coached" by their master for the occasion. They proved as satisfactorily as such facts are generally or can well be proved that the barge, at and on leaving the Pinner's Point pier, had her head and stern white lights and her red and green lights up and in place and burning. They proved, in the same manner, that the barge gave a signal of two clear whistles immediately when leaving the wharf, and two signals, each of two distinct whistles, very soon after giving the first signal. They proved that the helm was starboarded to go to port in accordance with these whistles; and the circumstances of the occasion showed that the barge had not acquired, so soon

after getting under way, as much headway as to permit of her striking with any force a vessel ahead of her. Disinterested witnesses on the wharf confirm, as far as they observed and recollected what transpired, the testimony of the barge's crew on all essential particulars. The case of the barge is proved by the consistent and concurrent testimony of all her crew, and is confirmed by all the disinterested witnesses who were examined on the subject. I do not feel justified in speaking in like terms of the witnesses for the respondent. The testimony of Dyott, the Foote's lookout, is anything but credible; and that of Hamilton, the pilot, fails to create the belief that he endeavored to "give the truth, the whole truth, and nothing but the truth." The testimony of the colored witnesses on the same side is contradictory, confused, and unconvincing. Like the testimony of the ignorant class of colored witnesses generally, it is obviously more compliant with the wishes of their employers than truthful for the truth's sake. I am unable to believe the testimony of the witnesses for the respondent, against that given by the crew on board the barge, and of the disinterested testimony of the men employed on Pinner's Point pier. I accept the testimony of the libelant as establishing the real facts of the case.

The steamer Foote came up the river from a distance below, and was in full command of her own movements. She was in condition to pass clear of the barge, which had but just got into partial motion. Her own lookout testifies that he saw the barge when the Foote was about midships of the red buoy, which is planted 470 feet below Pinner's Point pier. Either he neglected to report what he then saw to his pilot, or else the pilot neglected to recognize and respond to his report. If this had been done, there would have been no collision, and he was in fault in not taking heed of the barge in time, and maneuvering accordingly. Even independently and irrespectively of this fact, I think the collision was due, in chief part, to the ignorance, incompetency, and heedlessness of the man who acted as lookout of the Foote on this occasion. I desire in the present case to emphasize my reprobation of the employment of incompetent lookouts on steamers entering and moving in the crowded harbor of Norfolk, and the waters through which it is entered. The testimony of Dyott, the lookout, is essentially a confession of fault in almost every particular in which I have epitomized it in the résumé of facts and testimony which I have prefixed to this opinion. I feel that it was a piece of fatuity to intrust him with the duties of lookout in these waters on this fine steamer. His own evidence makes his conduct as lookout almost grotesquely absurd. He seemed to have heard nothing that he ought to have heard, to have seen nothing that it was his duty to see, and done nothing which he ought to have done. I think the casualty that happened was due to his incompetency as a lookout, and his failure to do in that important capacity what almost any person placed in his position would have done as a matter of common prudence, care, and attention.

I will sign a decree for the libelant.